# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MARSHA BELL,                    )
                               )
        Plaintiff,             )
                               )
    v.                         )    No. 3:04-0816
                               )    JUDGE ECHOLS
BEST BRANDS, INC.,             )
                               )
        Defendant.             )

## MEMORANDUM

Pending before the Court is Defendant Best Brands, Inc.'s Motion for Summary Judgment which has been filed under seal (Docket Entry No. 14) to which Plaintiff Marsha Bell has responded in opposition and Defendant has replied. Also pending is Plaintiff Marsha Bell's Motion for Partial Summary Judgment which has been filed under seal (Docket Entry No. 10) and to which Defendant has responded. Both motions will be denied.

## I.  FACTS

The relevant facts are as follows.[1]  Plaintiff Marsha Bell ("Bell") became employed by Best Brands on October 9, 2000. Best Brands is a family-owned business which, during the time of Bell's employment, had between forty and fifty employees. (Eskind Aff. ¶ 6).  Bell's employment was terminated on August 11, 2003.

---

[1]The facts as they relate to Defendant's Motion for Summary Judgment are construed in Plaintiff's favor whereas those which relate to Plaintiff's Motion for Partial Summary Judgment are construed in Defendant's favor. There is little overlap in the facts since Plaintiff's motion presents a discrete issue about who her supervisors were while she was employed at Best Brands.

1

A graphic artist by training, Bell was hired by Best Brands as a graphics designer to set up an in-house graphics department. Her duties included the creation of table tents, menus, wine lists, posters, signs, and banners. Additionally, Bell would enter billing information so that Best Brands could bill suppliers for the materials she created and the cost of those materials.

Seth Eskind ("Eskind") is the President and a co-owner of Best Brands. Eskind was Bell's supervisor. (Bell Depo. at 183). Towards the end of her employment, Bell would discuss such things as vacation requests with Bob Moses ("Moses"), who was the Chief Executive Officer and the other co-owner of Best Brands, but Bell did not view Moses as her supervisor. (Bell Depo. at 184). There were no individuals above Eskind and Moses in the hierarchy of Best Brands. (Eskind Depo. at 8-10).

Below Eskind and Moses were managers of several departments, including David Barnard ("Barnard"), who was the Wine Sales Manager and reported to Eskind. Although the graphics department was separate from the other departments, Bell was expected to do work assigned to her by the managers. (Moses Depo. at 10).

Underneath Barnard in the sales department were sales representatives. Sales representatives assigned graphic design work projects for customers to Bell. Even though Sales Representatives would review the work Bell did for them, Bell prioritized her workload. (Bell Depo. at 119-20; Eskind Aff. ¶ 5).

Bell has identified numerous incidents which make up her claim that she was subjected to a sexually hostile work environment. In roughly chronological order, those events are as follows.

Within the first few months of her employment, Beau Shadeed ("Shadeed"), a co-employee, commented to Bell, "You are almost thirty and have never been married and you don't have any children?" (Bell Depo. at 214). Bell characterizes this as suggesting that Shadeed was implying there was something wrong with her. Bell never reported this incident to anyone. (<u>Id</u>.).

Also early in her employment, Paul Grand, a co-employee burst into Bell's office and cursed at her, using the "F" word. (Bell Depo. at 241). This incident was not reported to management. (Moses Depo. at 48).

In the first year of her employment, Bell happened upon Ralph Whiteway ("Whiteway), a sales representative who was sitting in the sales office area at a laptop computer. Displayed on screen was a website titled "HOT TEEN PORN," on which were depicted images of scantily-clad or nude females. Apparently startled, Whiteway fumbled with the keyboard and managed to close the laptop. Nevertheless, Bell saw the site for a short period of time. (Bell Depo. at 143-148). Whiteway came to Bell's office later that day, apologized, said he was embarrassed, and it would not happen again. (<u>Id</u>. at 148). Bell considered the matter closed and did not mention the incident to anybody at Best Brands at that time. (<u>Id</u>. at 157).

Also during the first year of her employment, as Bell was walking down the hallway, she saw several salesmen gathered around

Case 3:04-cv-00816   Document 62   Filed 09/08/05   Page 3 of 26 PageID #: 121

the television in the conference room looking at a home video of people on a boat partying. Several of the women in the video flashed their breasts at the camera or at each other. (Bell Depo. at 188-190. Bell did not tell anyone about the incident at that time. (<u>Id</u>. at 191).

In September or October 2002, Joby Campbell, a Best Brands employee, commented about Bell's weight loss. In front of others he asked, "You don't have the hiv do you?" Upon questioning what he meant, Campbell replied, "You know[,] the HIV?" Bell responded she had been sick and had a thyroid condition. One of the employees present said his daughter too had a thyroid condition whereupon Bell left the area. (<u>Id</u>. at 192). Bell did not report this incident to anyone at Best Brands. (<u>Id</u>. at 194).

Late in 2002 or early in 2003, Bell observed four co-employees gathered around a laptop computer looking at a website where females (and at least one male) had animal costumes painted on their naked bodies. Bell viewed the screen "just long enough to realize what it was," told the group they were ridiculous, and walked out. (Bell depo. at 161). Bell does not know if she told anyone at Best Brands about the incident at that time. (<u>Id</u>. at 162).

In January 2003, Will Motley's ("Motley") voice appeared in the background of a voicemail message which had been sent to Bell by Catherine Oster. In the message, Motley was heard to be saying that he was going to pretend he liked Bell and be nice to her so that he could get Bell to complete his work. Bell does not contend

4

she reported this incident to Moses or Eskind. (Bell Depo. at 255-57).

Several of the incidents found to be offensive by Bell involved Barnard, the Sales Manager for Best Brands. On one occasion, as Bell was sitting on the couch in Barnard's office, Barnard told Bell about his sex life with his second wife. On another occasion, Barnard went into Bell's office, sat down beside her, placed his arm on the back of her chair, and again started talking about his sex life. (Bell Depo. at 216-17). Numerous times, Bell told Barnard she did not want to discuss his sex life with him. (Id. at 217). Bell did not report either incident to Eskind. (Id.).

Another episode involving Barnard occurred early in 2003. At the time, Bell had requested a two-week vacation so she could go to England to visit a friend. According to Bell, Barnard teased and demeaned her about the trip in front of others, as did Eskind, with Eskind suggesting she was going to have an affair while on vacation. (Bell Depo. at 253-54).

In March of 2003, Barnard walked in on a conversation among several employees concerning comments the Dixie Chicks had made about President Bush. Bell defended the Dixie Chicks, stating the comments were protected speech. Barnard replied, in an angry manner, "No, Freedom of Speech is when I say 'F' you." (Bell Depo. at 255). This incident also was not reported to Eskind or Moses.

In April of 2003, Whiteway submitted a job request for a "case card"[2] relating to a wine called Marquis de Sade which was carried by Best Brands. The job request asked for different sizes of case cards and suggested Bell should "have fun and show me what you can come up with." (Bell Depo. Ex. 2, p. 1). Attached to the request was a handwritten note from Whiteway which read as follows:

MARQUIS DE SADE
DECANTED MAGAZINE...SPANKING GOOD...
WINE SPECULUM  (W)ICKEDLY REFINED...
WINE MASOCHIST...KEPT GOING BACK FOR MORE...
ROBERT PACKER...OUCH... SO GOOD IT HURTS.

(Id., p. 2). Bell took the request to be particularly offensive, not only because of the reference to a speculum, but also because the "w" placed in parentheticals appeared to her to be an inappropriate drawing and "kind of looks like a vagina." (Bell Depo. at 172). Out of more than five hundred job requests received during the course of her employment, this was the only one about which Bell complained. (Bell Depo. at 188).

When Bell complained to Eskind, he threw the copy of the request he had been given into the trash and told Bell not to worry about it because he would take care of it. Eskind also told her she did not have to do anything she did not want to do. (Bell Depo. at 186). Bell claims Eskind then told her she needed to learn how to get along with everybody and become a team player. (Id. at 186).

_____

[2]A "case card" is a small card which is placed above cases of wine displays. (Bell Depo. at 166-168).

Some time shortly before the above incident, Bell opened the door to a conference room where she observed Office Manager Janet Pruitt ("Pruitt") and Shadeed watching a video of Pruitt's female lover who was nude and gyrating on a bed. Eskind was also in the conference room. Bell closed the door and went and told Shelly Rowland ("Rowland"), a co-employee, what she had seen. Rowland went to the conference room, opened the door, looked in, and closed the door. Bell then saw Eskind and asked him if he was in the conference room with Pruitt and Shadeed, to which Eskind laughed and said, "Yes." (Bell Depo. at 194-197).

At some point (the time is unclear), Shadeed and Barnard were talking in a normal tone of voice when Barnard said to Shadeed that Bell did not bring what Seema Forti ("Forti") brought to the table. Bell took this as implying what Forti brought to the table was her sex because Shadeed and Barnard were gawking at Forti when the statement was made. This incident also was not reported to anyone at Best Brands. (Bell Depo. at 214-15).

Another incident of unspecified date occurred as Bell was implementing a new job request system. Doug Watts ("Watts"), a co-employee, asked why Bell could not just keep a spiral notebook by her phone to log requests. Bell replied the new form would allow her to track each request so she could easily find a menu or poster at a later date. From then on, Watts referred to Bell as "poster girl." (Bell Depo. at 230-232). Bell does not recall if she reported this to Eskind. (Id. at 232).

7

Still another incident of unknown date relates to a comment made by Eskind to Janet Pruitt. During their discussion, Eskind opined Best Brands was the only company he knew of where "the women sexually harass more than the men do." (Bell Depo. at 261; Eskind Depo. at 54).

On more than one occasion during Bell's employment, Eric Chellman ("Chellman"), another of Bell's co-employees, snapped at Bell in a hostile and aggressive tone of voice during which he also made barking sounds. Such incidents were not reported to management. (Bell Depo. at 236-238).

Chellman also entered Bell's office and told her about visiting his girlfriend in Florida. Chellman and his girlfriend argued and, in an effort to calm her, Chellman said he fondled his girlfriend's breasts. Upon hearing this, Bell turned to work on her computer and Chellman left to answer a call on his cellphone. (Bell Depo. at 237-239). Bell did not report this incident to anyone at Best Brands. (Id. at 249).

Several months before Bell's termination, Best Brands hired Cliff Long for the newly created position of Operations Manager. Long's initial job was to review all aspects of the business. Long found the graphics department to be deficient because it was not paying for itself, it needed more qualified personnel, and Bell was inadequate for the position she held. (Long Depo. at 9-15, 20-21). Though disputed by Bell, Moses, Long and Eskind believed Bell was slow in getting the work done, was frequently late, and spent too much time on social phone calls. (See, Eskind Depo. at 18, 26;

8

Moses Depo. at 17-20; & Long Depo. at 20-23). Others too thought Bell was difficult to work with and slow in getting the work done. (See, Nelson Depo. at 8-11 & Shadeed Depo. at 11-12; 20-23; 25-27).

On August 11, 2003, Bell was called into Moses' office and told that Best Brands had decided "to go a different direction" and that Bell's services were no longer needed. (Bell Depo. at 286; Moses 34-35). Bell became very upset and could not believe she was being terminated after all she had done for the company in setting up the graphics department. During the meeting, Bell told Moses about a couple of incidents involving Whiteway and Barnard. This was the first time she had told Moses about any alleged harassment or abuse. As Bell was leaving Moses' office she told him that if anything negative was said about her she would sue him. (Bell Depo. at 288-294).

After Bell left the premises, Moses spoke with Whiteway about the incident involving the teen pornsite on the laptop. Whiteway explained it was just a popup of a website and that he had apologized to Bell. Moses told Whiteway such conduct would not be tolerated at Best Brands. (Moses depo. 41-42).

Bell filed a complaint with the Equal Employment Opportunity Com mission (EEOC") and received a right to sue letter dated June 16, 2004. This litigation followed. In a Complaint filed September 10, 2004, Bell alleges she was subjected to a hostile work environment and, when she complained, she was discharged in retaliation.

Bell has moved for partial summary judgment on the question of who her supervisors were while she was employed at Best Brands. For its part, Best Brands seeks judgment in its favor on both of Bell's claims. After a review of the standards governing summary judgment, each motion will be considered in turn.

## II.  <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the

10

moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

#### A.  Plaintiff's Motion For Partial Summary Judgment

Bell asks this Court to hold, as a matter of law, that not only was Eskind as President of Best Brands her supervisor for purposes of Title VII, but also that Sales Manager Barnard and/or the Sales Representatives were also her supervisors. This Court will decline that invitation.

The distinction between whether an alleged harasser is a co-employee or a supervisor in employment discrimination cases is of great significance in light of the Supreme Court's companion decisions in Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries Inc. v. Ellerth, 524 U.S. 742 (1998). If the alleged harasser is a co-worker, the employer will be liable only if the plaintiff can show the employer knew, or should have known, about the harassment and failed to take appropriate remedial action. If, however, the alleged harasser is a supervisor,

11

liability for the employer is automatic if a supervisor engages in sexually harassing conduct that results in a tangible employment action. Faragher, 524 U.S. at 761-73; Ellerth 524 U.S. at 761-63.

The courts are split as to how to define a "supervisor" for Title VII purposes and the Sixth Circuit has not directly spoken to the issue in a published opinion. Most courts consider "a supervisor to be a person with immediate or successively higher authority over the employee who exercises significant control over the employee's hiring, firing, or conditions of employment." Browne v. Signal Mountain Nursery, L.P., 286 F. Supp.2d 912 (E.D. Tenn., 2003)(collecting cases). "[A] minority of courts and the EEOC have adopted a broader view defining a supervisor in terms of an individual's power or authority to adversely affect the victim's working environment and otherwise restrict the victim's freedom or ability to respond." Id. (collecting cases). Thus, under the minority view, the definition of a "supervisor" extends not only to one who has the power to hire, fire, demote, transfer or discipline, but also one who directs the work activities of the employee.

Having reviewed the case law in this area, this Court agrees with the conclusion in Browne that a supervisor is "an employee who has the power to make economic decisions and affect tangible employment actions with respect to subordinates." Browne, 286 F. Supp.2d at 913. Hence, "an employee does not qualify as a 'supervisor' for purposes of Title VII employer vicarious liability unless he or she is placed by the employer, formally or informally,

12

in a position of superior authority and possesses some significant degree of control over the hiring, firing, demotion, promotion, transfer or discipline of subordinates." Id. at 918.

This definition has support not only in the majority of the cases which have addressed the issue, but, as noted by the Court in Browne, is supported by language in Ellerth. There, in discussing the difference between a supervisor and co-worker, the Supreme Court observed:

> [O]ne co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

Ellerth, at 762. This language suggests that a supervisor has the ability to make economic decisions affecting others, not merely the ability to direct their work activities.

Further support for the definition accepted by this Court can be found in the Sixth Circuit's unpublished decision in Stevens v. United States Postal Service, 21 Fed. Appx. 261, 263-64 (6th Cir. 2001). There, a former employee sued her employer alleging, among other things, she had been subjected to sexual harassment. On appeal from the grant of a motion for summary judgment, the Sixth Circuit noted that the case involved what could best be described as co-worker harassment because the alleged harasser did not have the formal title of supervisor, nor did he have the power to hire or fire the complainant. No mention was made of the alleged harasser's ability to affect the employee's work environment.

13

Finally, support can be found in prior decisions of the Sixth Circuit on the issue of who is an agent of the employer in supervisor sexual harassment cases. For example, in Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803 (6th Cir. 1994)(citation omitted), the Sixth Circuit, after noting "agent" was not defined in Title VII, stated courts have interpreted the term to apply to an individual who "serves in a significant supervisory position and exercises significant control over the plaintiff's hiring, firing, or conditions of employment." Here again, the focus is on significant supervisory control over the employee who is alleging harassment.

With this Court's conclusion that "supervisor" should be defined as set forth in Browne, it is clear that neither the Sales Manager nor the Sales Representatives of Best Brands were supervisors of Bell for purposes of imposing Title VII liability. Unquestionably, Eskind and Moses, the President and CEO respectively of Best Brands, were "supervisors" of Bell since they each had the power to fire, discipline, demote or transfer her.

Contrary to Bell's statement in her deposition that Eskind was her immediate supervisor, Bell now claims Barnard and the Sales Representative were also her supervisors. In an affidavit filed in support of her motion for partial summary judgment, Bell avers Barnard "approved 'House' projects"[3]; Barnard had authority over her schedule and work hours; Barnard would occasionally direct her

---

[3]A "House" project is used for different customers as distinct from those which are prepared solely for one customer.

14

to sit at the reception desk and answer the telephone; she understood Barnard had the authority to give her warnings regarding job performance; and both Barnard and the Sales Representatives would review with her the status of their projects and had final approval authority with respect to those projects. (Bell Aff. ¶¶ 1-5).

Leaving aside the fact that absent from her affidavit is any suggestion either the Sales Manager or the Sales Representatives had any authority to hire or fire her, Bell's affidavit conflicts with her deposition testimony in several important respects. Whereas in her affidavit Bell suggests Barnard was her supervisor, in her deposition she identifies her supervisor as Eskind. (Compare Bell Aff. ¶ 2 & Bell Depo. at 183-184). Further, in her affidavit, Bell claims Barnard had authority over her schedule and her hours; yet, in her deposition, Bell testified, "I didn't have to go to him [Barnard] and say I'm not going to be here tomorrow or I didn't have to go and ask him permission to buy something. . ." (Bell Aff. ¶ 2; Bell Depo. at 221. Quite the contrary, Bell stated in her deposition she initially went to Eskind about vacation requests and those sorts of things and later went to Moses about such matters. (Bell Depo. at 184).[4]

_____

[4]Bell's belated suggestion that Barnard was her "supervisor" is also belied by the facts underlying her objection to the Marquis de Sade request from Whiteway. Upon receiving the request, Bell happened to run into Barnard and told him about the request. Although Barnard stated he did not know what was wrong with the request and told her to do it, when Bell refused he told her they would see what Eskind had to say about it when he returned from vacation. Bell did in fact take the request to Eskind who threw it

"When a motion for summary judgment has been filed, a party cannot create a factual issue by filing an affidavit which contradicts earlier testimony." Lanier v. Bryant, 332 F.3d 999, 1004 (6th Cir. 2003). If the submission of a self-serving affidavit which contradicts prior deposition testimony is insufficient to avoid summary judgment, United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 303 (6th Cir. 1998), such an affidavit most certainly cannot be used to support what may essentially be dispositive of a claim.

Yet even if this Court were to consider Bell's affidavit and find it not necessarily inconsistent with her deposition testimony, this still would not aid Bell. At best the record presented by Bell would suggest a question of fact as to whether the Sales Manager and the Sales Representatives were her supervisors, particularly since Moses, Barnard, Eskind and some of the Sales Representatives have indicated only Eskind and Moses had the ability to hire, fire, promote, demote, transfer or discipline Bell. ( See, Affidavits of Barnard, Moses, Eskind, Neslon & Shadeed). This question of fact would preclude summary judgment in Bell's favor on the issue of who her supervisors were for purposes of Title VII.

**B.** **Defendant's Motion for Summary Judgment**

Bell's claim against Best Brands is two-fold. First, Bell argues she was subjected to a hostile work environment. Second,

---

away and told Bell she did not have to do it. (Bell Depo. at 180-184).

16

Bell asserts she was discharged in retaliation after she complained about the hostile environment.

### 1. *Hostile Work Environment*

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for a covered employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .". 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment' . . . includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 20, 114 S.Ct. 367 (1993).

"In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment; and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior." Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000). Best Brands contends Bell has failed to show either that the alleged harassment created a "hostile work environment" as that phrase has been described by the courts or that Best Brands failed to take care to prevent and correct the alleged wrongful behavior. A fair reading of the record, however, shows Bell has presented sufficient evidence to preclude the entry of summary judgment on her hostile environment claim.

17

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, supra 510 U.S. at 21. Hence, "not all workplace conduct that has sexual overtones can be characterized as harassment and forbidden by statute." Black v. Zaring Homes, Inc., 104 F.3d 822, 825 (6th Cir. 1997). Instead, "[t]he concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women." Bakersville v. Culligan Intern. Co. , 50 F.3d 428, 430 (7th Cir. 1995).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive. " Bowman, supra, 220 F.3d at 462. "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

18

whether it unreasonably interferes with an employee's work performance.'" Id. quoting Harris, 510 U.S. at 23.

In this case, Best Brands contends that when viewed in light of the totality of the circumstances, Bell cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of her employment. On this score, Best Brands asserts many of the incidents were not even directed at Bell including the time when she approached Whiteway who fumbled to close his laptop which had on the screen a website titled "HOT TEEN PORN SITE"; the time she walked in a room and observed co-workers looking at a website where people had animal costumes painted on their naked bodies; the time she passed by a conference room and observed salesmen viewing a home video of women flashing their breasts while aboard a boat; the time she opened the door to a conference room and saw workers viewing a videotape of a worker's lover who was naked and gyrating on a bed; and the time Eskind told another that Best Brands was the "only company where women sexually harass more than men do."

Best Brands also asserts several of the other incidents cannot support a claim for sexual harassment because Bell has not shown the alleged harassment was based upon her status as a female. This would include the times Chellman snapped at Bell and made barking sounds; the time she commented on the Dixie Chick's right to voice their opinion and was chastised by Barnard who said "Freedom of Speech is when I say 'f' you"; the time Motley said he would pretend to be nice to Bell so that she would get his work

19

completed; and the time Campbell asked her if she had lost weight because she had HIV.

It is true, as Best Brands points out, some of the incidents were not directed at Bell[5] and some of the incidents were, at least arguably, not based upon Bell's status as a female. Moreover, some of the incidents might not even fairly be characterized as harassing.

All that said, however, this Court is to look at the totality of the circumstances in determining whether sufficient evidence exists to warrant a jury trial on whether the alleged conduct rises to the level of sexual harassment. The Court is not to disaggregate the incidents by "divid[ing] and categoriz[ing]" them because to do so "divorc[es] them from their context and depriv[es] them of their full force." Williams, supra 187 F.3d at 562. This is because "when the complaints are broken into their theoretical component parts, each claim is more easily dismissed." Id. Instead, "the totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." Id. at 563.

"[M]indful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of

_____

[5]Notably, though not necessarily directed at Bell, many of the incidents, including those involving displays of pornography, were in fact witnessed by Bell.

20

alleged hostility," id., this Court must conclude a rationale jury could determine Bell was subjected to a hostile work environment or, at the very least, Bell's allegations raise questions of fact for the jury. After all, the workplace Bell describes was replete with instances of pornographic videos being shown; explicit discussions of sexual activities; and the utilization of vulgar, sexually charged language containing sexual innuendos, among other things.

Separately, each incident might not be considered to be severe and pervasive since none was particularly egregious. However, when combined it is clear that sufficient facts have been forwarded which could support a jury's verdict that Bell was subjected to a hostile work environment. See, Bakersville, supra, 50 F.3d at 431 (there is no bright line "between a merely unpleasant working environment . . . and a hostile or deeply repugnant one...; and when it is uncertain on which side the defendant's conduct lies, the jury's verdict, whether for or against the defendant, cannot be set aside in the absence of trial error").

Having concluded there are sufficient factual questions to preclude the entry of summary judgment on the issue as to whether workplace harassment existed, the inquiry does not end because Bell must also show Best Brands bears responsibility for the harassment. As already indicated, if the alleged harasser was Bell's supervisor, Best Brands would be strictly liable if the harassment culminated in a tangible employment action against Bell; whereas, if the harassing parties were merely co-workers, Best Brands would

21

not be liable unless Bell shows Best Brands knew, or should have known of the harassment and failed to take appropriate remedial action. See, Faragher, supra, 524 U.S. at 807; EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 518 (6th Cir. 2001).

Best Brands points out that prior to the day Bell was terminated, she complained only about the Marquis de Sade incident to her supervisor Eskind. Best Buy asserts that since this was the first it knew about any alleged problem and the matter was resolved, it cannot be liable. This Court, however, believes whether Best Brands knew or should have known of the conduct yet failed to take appropriate action is also a question for the jury to decide in this case.

The record suggests the purportedly harassing events were not isolated. For example, sexually explicit videos were shown in the workplace on at least four occasions and, in fact, according to Bell, Eskind, the President of the company, laughed about seeing the video of an employee's lover filmed in the nude. Eskind himself is said to have made the comment Best Brands is the only company where the women sexually harass more than men, inferring he had some knowledge of untoward conduct in the workplace. Eskind also allegedly participated in the ribbing of Bell suggesting that when she went on vacation she was going to be intimate with a man who was not her boyfriend.

Moreover, Best Brands' suggestion that the Marquis de Sade incident was properly handled is not necessarily borne out by the facts. According to Bell, although Eskind threw away the request

22

and told her she did not have to do it, he also told her that she needed to be a team player and learn how to get along with everybody. (Bell Depo. at 186). One inference which may be drawn from this discussion is Eskind was suggesting Bell should just accept things as they are and go along with the conduct. Additionally, shortly after the Marquis de Sade episode and Eskind's alleged statement that Bell needed to be a "team player," Bell found herself without a job. These events could lead a jury to conclude that appropriate remedial action was not in fact taken.

### 2. *Retaliation under Title VII*

In order to establish a *prima facie* case of retaliation under Title VII, Bell must show: "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action." Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

23

In the present matter, with respect to the *prima facie* case, Best Brands asserts Bell cannot meet the fourth element of showing a causal link between her refusal to do the Maquis de Sade job request and her termination. The Court disagrees.

"Although no one factor is dispositive in establishing a causal connection, evidence that...the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." <u>Nguyen v. City of Cleveland</u>, 229 F.;3d 559, 563 (6th Cir. 2000). Importantly, "[t]he burden of establishing a *prima facie* case of retaliation is not onerous, but one easily met." <u>Id</u>.

Recently, in <u>DiCarlo v. Potter</u>, 358 F.3d 408, 421 (6th Cir. 2004), the United States Court of Appeals for the Sixth Circuit observed "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of discrimination." In making the observation, the Sixth Circuit cited several cases, including <u>Parnell v. West</u>, 1997 WL 271751 at *3 (6th Cir. May 21, 1997) which noted that although "[a] time lag of seven months does not necessarily support an inference of a causal link, previous cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than sixth months."

Given that the burden of establishing a *prima facie* case in a retaliation action is "one easily met" and that Bell was terminated

24

within four months of her complaining about the Marquis de Sade episode, this Court concludes there is sufficient indirect evidence of a casual connection between her complaint and firing so as to create an inference of retaliatory motive, particularly since up until that point Bell apparently had not been the subject of any disciplinary action or serious complaints about her work activities. <u>See</u>, <u>Bainbridge v. Loffredo Gardens, Inc.</u>, 378 F.3d 756, 761 (8th Cir. 2004)(more than a temporal connection between the protected activity and the adverse employment action must exist and jury question was presented where, shortly after complaint, employee was terminated even though before then he had no extensive disciplinary record).

With this conclusion, there remains the question of whether Best Brands has forwarded a legitimate non-discriminatory reason for its actions and, if so, whether Bell can show this stated reason is pretext. Best Brands states its true reason for termination was Long's conclusion that the graphics department was not paying for itself, as well as his and the owners' view that Bell was slow in completing her work, was frequently late for work, and spent too much time on social calls. Even if this is so, there is sufficient evidence from which a jury could conclude such proffered reasons are pretextual.

Long was recently hired by Best Brands and so presumably would not have a great deal of knowledge about Bell's past work habits. Moreover, conspicuously absent from the record are any personnel documents which would suggest Bell was ever cautioned about her

25

work ethic, tardiness, excessive personal calls or the untimeliness of her work. Instead, all the Court has before it is the testimony of Best Brand employees on the one hand about Bell's performance (or lack thereof), and Bell's portrayal of her work. Obviously, such conflicting accounts are not susceptible to resolution by way of summary judgment.

Further, if in fact Bell was less than a stellar employee, corrective action could have been taken earlier. Why she was terminated in August 2003 after several years of employment during which she apparently received no formal disciplinary action will be for the jury to decide.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Motion for Partial Summary Judgment filed by Bell (Docket Entry No. 10) shall be DENIED. The Motion for Summary Judgment filed by Best Brands, Inc. (Docket Entry No. 14) shall also be DENIED.

An appropriate order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

26